Number 182089, Dantzler, Inc. et al. v. Puerto Rico Ports Authority. Thank you. Mr. Lopez, good morning. Good morning, Your Honor. May it please the Court, I'm Erierto Lopez for Defendant Appellant at the Puerto Rico Ports Authority. Your Honors, this case challenges PRPA's capacity to implement a program, a scanning program, that focuses on vital public functions. After the September 11 attacks, port security became a matter of concern for many governments. In Puerto Rico's case, those concerns were even greater given the island's high dependency on transportation by sea. Accordingly, the government of Puerto Rico entrusted PRPA with new responsibilities. Those responsibilities expressly called for PRPA to implement a cargo scanning program focusing on three important matters, national security, detection of illegal contraband and weapons from entering the island, and enhancing the tax collection efforts of the government. Now plaintiffs who are sellers of imported goods brought into the island claim that PRPA doesn't have the necessary authority to implement the program. And they're challenging PRPA's whole authority to implement the program to the point that they're asking for every single penny that PRPA has collected from the enhanced security fees. Now they do so even though five different courts have held that PRPA's program is either up or constitutionally valid, or that PRPA has the powers to implement the program and that PRPA is perfectly capable to collect the enhanced security fees on the program. Now as to, I would like to address quickly the... Let's assume hypothetically that there is an unconstitutional fee, that the fee is unconstitutional. What is, if the parts authority has sovereign immunity, what is the remedy to get that fee back? If PRPA is subject to sovereign immunity, Your Honor? Yeah. If they can't be sued, what is the remedy to get the fee back? There's no remedy to get the fee back. There's no remedy to get the fee back? You can just collect an unconstitutional fee and there's no remedy? If PRPA were to be subject to sovereign immunity, Your Honor, it would be shielded from damages claims. It could be subject to a prospective injunctive relief in favor of plaintiffs. Well, I'm not sure that's right. I mean, there are state tax cases not cited here which suggest that you have to provide a remedy for unconstitutionally collected tax. I'm not sure why the same thing wouldn't be true in this context. In this case, Your Honor, I think the difference is that we're talking about a user fee for a service that PRPA does provide for a service that has been considered valid by this court and most recently by the Supreme Court of Puerto Rico. And I think that speaks volume because, I mean, we've been subject to many, many attacks. Well, if the fee is valid, there's no problem. The question is if it's hypothetically invalid. Well, there seems to be a problem. Right. But there's quid pro quo here. There's a service that's being provided that this very court has considered to be valid, that has considered to be proper, that this court has validated the fee as not being an excessive fee when compared to the service that the regulated entities, in this case, who are the ocean carriers that are absent from this court, do receive from PRPA. Now as to quickly understanding issue, now PRPA is the entity that imposes the fee. There's no question about that. But we don't impose the fee on plaintiffs. Plaintiffs don't pay the fee upon PRPA. Now the ocean carriers is what they hinge on to establish a causal link to PRPA, but that causal link is broken because it hinges on the independent decision, that commercial decision discretion of their ocean carriers. Now the link is further broken by plaintiffs on discretion to pay for that fee, that commercial fee that they separately pay to their ocean carriers. Now as to the prudential limitations, your honors, I think it is important to mention that that matter was fully briefed by PRPA before the district court. We cited to the Banner-Leans decision, and this court in the past has referred to Banner-Leans as heavy artillery. It's not a low bar, it's heavy artillery. And as to the limitations themselves, this is a classic case where an entity is claiming to have, to assert the rights of a third party that is absent from this case. If we go back to the district court, the district court is ready to implement the Evansville test to determine if the fee is excessive when compared to the service that is receiving the regulated entity. Those are the ocean carriers. Now, what plaintiffs will be doing in that case is stepping on the shoes of the ocean carriers to challenge the fee imposed upon them. Now as to immunities, your honors. Is there anything in the record as to how much of the fee actually gets passed along to the plaintiffs? No, your honor. We're now at the pleading stage, and we don't have that information. Are there any allegations in the pleadings? Do they allege 100% pass along? That's what I think they allege, or even greater than that, but we don't know for sure. Now as to immunity, your honors. The structural indicators in this case point heavily in favor of immunity for PRPA. But you've got a problem with the Grajales case, right? No, sir. Actually, we understand that the Grajales case foresaw what would happen in this case, and that indeed it was confirmed recently by the Supreme Court in the Taggart decision. In that case, which Thompson was part of the panel, the circuit court held that hybrid entities could be subject to immunity in certain cases based on their functions. Now, the Grajales case did not discuss PRPA's functions in that case because none of the parties raised that issue. But I think it made clear in footnote nine that it was standing ready to consider hybrid entities to be subject to immunity in certain cases, like PRPA is in this case, your honor. Now, I'd like to address them in the order of relevancy. As to PRPA's functions in this case, it's undisputed that we're talking about purely governmental functions, national security, detection of illegal contraband, and enhancing tax collection efforts. The district court, however, declined to analyze that factor, stating that it did not advance the inquiry, given that PRPA has a mix of functions, some of which are proprietary and others which are governmental. Now, that's contrary to what Grajales actually stated in footnote nine. Now, the second factor is the financial relationship between PRPA and the Commonwealth in this case. And I think this speaks volumes. It's no secret that PRPA is separate and apart from the government, that it can sue and be sued on its own terms. And if you see it on its day-to-day operations, there is a financial separation between itself and the government. But when it comes to this case, Act 12 of 2008 expressly states that Puerto Rico's credit, Puerto Rico's budget, and Puerto Rico's power to levy taxes are ready to comply with the program. Should PRPA be unable to finance the program through other sources? Now, the district court, when it analyzed that particular factor, held that Act 12 expressly stated the opposite, that there was no such financial support from the Commonwealth at all. The following factor would be how state law has characterized PRPA. In this regard, the district court focused on PRPA's enabling it, which is a good step in the right direction, but it felt short. Yeah, I would have thought you would argue that under Grajales' footnote nine, this is a government function, and that even if the structural and financial impact tests led to a result of no sovereign immunity, that still there would be sovereign immunity for a government function. No, Your Honor. Our position is more modest than that. We're actually, we understand we comply with each of the elements that the Grajales court analyzed and that this court said in the Fresenius decision, that we comply with each of the structural indicators. You don't argue this is a government function? It is a government function, and we comply with that indicator, which is one of them, but we also comply with the other indicators that are relevant to the inquiry as well, which are the financial relationship between PRPA and the Commonwealth, and how the state law has characterized PRPA, and the power, the control exercised by the Commonwealth. So why is this a government function? It is a government function, Your Honor, because it's focused on purely governmental functions. National security by protecting the people of Puerto Rico and the people of the United States from terrorist attacks. That's undisputed on the record, Your Honor. It also focuses on the illegal entry of weapons and contraband to the island to maintain its safety and security. And third, it enhances the Treasury Department's ability to collect taxes. Before the program was implemented, Treasury merely scanned or inspected 7,000 containers, Your Honor. After, the year after, it jumped to 300,000 containers. Now, as to how state law has characterized PRPA, the district are focused on its Enabling Act, but did not go into analyzing Act 12, which characterizes PRPA as a security arm of the state for purposes of the scanning program, and it did not analyze the state court decisions that we have in this case. And this court has stated that looking at those state court decisions is relevant and it's helpful in the analysis. Now, the Supreme Court of Puerto Rico just recently held, and we submitted that in our 28-day letter, that PRPA has the necessary power under its Enabling Act to perform the task of collecting the enhanced security fees and that PRPA is compliant with the express mandate in Act 12. As to the last structural indicator, I'd like to add that PRPA also enhances the Treasury Department abilities to collect taxes, and I think that also goes, Your Honor, to the function that PRPA is performing in this case. Now, the last indicator goes to the control exercise by the government of Puerto Rico over PRPA, and I think it's undisputed that the district court held that indeed it exercises a significant control over PRPA and that that factor weighs heavily in favor of immunity. So our position in this case is that when you consider all the factors together, they act as an arm of the state. And to go into the hybrid argument... I may be asking a question that I shouldn't know, but does the poorest authority... Who pays for any judgments against the poorest authority? Where does that money come from? That money comes from the poorest authority itself, Your Honor. Is that funded by the state in any way? We do receive certain funds, but we're solely liable for the judgments against the PRPA. With that, Your Honor, that goes to the second step of the analysis, which this court doesn't have to go into that if the structural indicators point in favor of immunity, which they do in this case. Now, from a legal standpoint, Your Honor, that's a very important distinction, but practically if you look at it in practice, if plaintiffs are successful in this case and PRPAs are able to collect the enhanced security fees, the treasury coffers will be hit. According to Act 12, Puerto Rico will have to step in and finance the program. So there's a practical effect, but not a legal one, Your Honor. If I may, I would like to save what's remaining of my time for rebuttal. All right. Mr. Stephens. Thank you, Your Honor. I'm Elwood Stephens. I'm going to address the same issues I did earlier on standing, causation, and the prudential standing rules. In this case, Mr. Alberto Castagne is going to address the sovereign immunity issue. I will address the cases that were brought up, and first, I'd like to talk about the hypothetical that Judge Dick brought up. Vasquez in 2013 held that as to cargo that was not scanned and fees charged and collected on cargo that was not scanned, the regulation was unconstitutional. And he enjoined any further charges for cargo that either entered through a terminal that had a scanner but was not scanned or entered through a terminal that did not yet have a scanner. Nonetheless, the Ports Authority, with the cooperation and participation of RAPI Scan, continued to charge on every piece of cargo that entered the Port of San Juan whether or not it entered through a terminal that had a scanner or entered through one that had a scanner but wasn't scanned. And this is paid by the carrier? I'm sorry, Your Honor? And these fees are paid by the carrier? The ocean carriers or the de facto collection agents for? Well, if they're paid by, do you represent the carriers? No, sir, Your Honor. Well, then why, how is your standing involved here? Our standing is based upon, the standing challenge under Article 3 is that we have injury in fact. I don't think there's any doubt about that. We have certainly plausibly alleged that our clients paid all that money. The causation issue. But if it's your clients that paid it rather than the party you represent. Our clients are the importers. We are ultimately the payors of the enhanced security fees and we are in a symbiotic relationship with the ocean carriers. There are only six or eight carriers. What case says that someone who doesn't pay the fee or a tax can sue to collect it? There are a lot of cases, I mean, you talk about Lujan and all these cases. They all seem a little bit far afield from that, from this situation where somebody who didn't pay a fee, who didn't pay a tax is suing to collect it. How can you do that? Those are the third party cases that Judge Wald from the D.C. Circuit wrote about so eloquently and they're competitive enterprises, public citizens and National Wildlife Beholder. Those aren't cases involving fees or taxes. Those aren't cases involving fees or taxes. When I'm asking for what case says that someone who doesn't pay a fee or a tax can sue to collect the fee or the tax? I just would say I don't have a specific case that says that except all the line of cases that say as long as the fee is fairly traceable, the fee that we paid, our injury is fairly traceable to the conduct of the defendant, it's actionable and we can enforce it because they knowingly participated in collecting fees on cargo that was never scanned. Maybe I don't understand something here. Maybe you can help me. The fee that you pay, you pass on to the carriers. Am I correct? No, sir. The ocean carriers or the terminals like Ayala? We're the importers. We're their customers. The fee that you say you pay, you pass on to the carriers. Am I correct? Yes, I think that's a yes or no answer that I'm asking for. Our clients don't pass it on. We absorb it. That's our allegation. You don't pay the fee at all. We pay it to the ocean carriers, Your Honor. The ocean carriers pay the fee. And then they pay it to the Port Authority. That's correct. We pay, the ultimate payors. The ocean carriers in fact brought claims in the Vasquez case and they were met with a defense. The defense was that you do not have injury in fact because you pass the cost on to the shippers, the importers. And so they didn't have standing to bring a claim. That was an argument presented to them. To the extent that there are ocean carriers who didn't pass it on to us, we didn't pay it. It's not part of our damages. But those are issues of case management, issues of damages, issues that we would like an opportunity to present to the trial court and decide. There's no double recovery to anybody, Your Honors. We're just asking to get paid back for what we paid. You didn't pay anything. You never paid the Port Authority anything, right? No, sir. We paid the ocean carriers. And the ocean carriers, by contractual agreement, Port Authority collected the money and then shared that money with RappiScan, retaining some of the money for themselves. To address Judge Thompson's question earlier, in that case, 97% of the fees collected went to RappiScan. The remainder of it was shared among the Treasury Department and to pay for Port Authority's personnel. How can you charge tens of millions of dollars and claim that it's not excessive when it's supposed to be designed to defray cost? What are you defraying cost of if there's no scanning station there, if there's no personnel there, if there's no scan transaction being created by RappiScan, why do they need to maintain equipment or repair equipment? It's just the cases on third party cases that are cited in our brief, Your Honor, basically say as long as it is traceable. Luan says that. All the Article III cases say that. That as long as the injury complained of is fairly traceable to the conduct of the defendants, then you do have standing to assert that claim. There is a causal connection. It does not have to be a direct causal connection. This Court said exactly that in Gutierrez v. Cortellana in 1989. That personal participation is not the only predicate. We don't have to personally pay the fee. They don't have to personally collect the fee. It just has to be reasonably foreseeable. In fact, it was contractually foreseen that we would pay those fees. There's no other customer for the ocean carriers. But for the shippers and importers that we represent, Dantzler, et al., those ocean carriers would not be able to exist. But it's like all the other costs that carriers have. They pass it on to their customers who happen to be the shippers. Well, this is a specific fee that they were having to pay, and they had to pay it on cargo that did not get scanned. That's the unconstitutional. What about if the Port Authority erases the cost of the ship's docking, and they pass that cost on to you, the shippers? Would you have a cost of action on that? No, sir. That's a separate warfage fee, and they got something for it, and it actually occurred. And I don't know that those things are actually passed on to the shipper importers. But in the context of this case, let me close by saying this. I'm out of time. I have a few seconds left. Thank you. But in the final word here, Your Honors, from us, Dantzler, et al., were the foreseen direct fee payors, the cost bearers of millions of dollars of fraudulently and unconstitutionally collected fees. They've plausibly pled these facts at this phase of the litigation. And the trial court was correct in holding that we plausibly pled facts which establish standing, a violation of the Commerce Clause, state action, and personal economic losses protected by the Commerce Clause. And we ask that this Court affirm the District Court and allow us to litigate these claims. Thank you very much, Your Honor. Thank you. Mr. Castaner, you're on. Good afternoon, Your Honors. I please the Court. My name is Alberto Castaner, appearing on behalf of Planned Capital Police, the importers. I will be addressing the Court in regards to the issue of lack of 11th Amendment immunity available to the Puerto Rico Port Authority. Your Honors, it's our position that the Puerto Rico Port Authority is not entitled to the 11th Amendment immunity, mainly for three reasons. First, this Court has squarely decided the issue less than four years ago in Grajales. And since then, nothing really has changed. The analysis is still the same and the result yielded by the test would be the same. Number two. What about that footnote where we left open the possibility? Well, yes, Your Honor, but there are also footnotes and decisions that tend to show otherwise. For example, the Court stated specifically that I'm looking for a quote. Bear with me. And we do not treat as is positive as Prince and Royal Caribbean appear to suggest that we should. The nature of the particular function that the PRPA was performing that gave rise to the plaintiff's claim in this suit. So regardless of whether the activity is commercial. The operative word was in the suit. That suit. Yes, Your Honor, but also on footnote number seven, it talks about the hybrid type of functions that a corporation may perform as in discussing the district circuit decision in the FMC case about that. And this Court has said on the seventh footnote that that issue appears to be mirrored by the second step in the Fresenius test. Still, Your Honor, we believe that even if that was the case, the Postal Authority has not been entrusted with governmental functions. To the contrary, it runs and has always run commercial enterprise, which is marine terminal operations and scanning is just part of another service that they provide. And lastly, we believe that Puerto Rico is not a sovereign. How do you address their argument that scanning goes to protecting the citizens from terrorism as well as enhancing tax collection on goods that may be smuggled? Okay, Your Honor, their sole argument is that Act 12 entrusted the Postal Authority with law enforcement powers and tax collection powers. That is not the case. Act 12 mentions the Postal Authority only once, and in one sentence it says, by certain date, the Postal Authority shall implement, should say implant, because the word in Spanish was implantar, not implementar. But still, it says the Postal Authority shall implement a fast cargo valuation lane on or before X date. That is it. And it's far-fetched to include and perhaps dangerous to hold that a single line like that would place upon the Postal Authority law enforcement powers to search, seize, and arrest people and to collect taxes. Their participation is limited to providing the facility to conduct the scanning. And that's what they do. They own and operate the port. That's what their enabling act says they do. That's what the Federal Maritime Commission has held that they do. But why can't their police power be simply searching? Scanning is searching. It is searching, but what happens when you find maybe illegal drugs or contraband? They work in conjunction with the other agencies. Why isn't that just a group effort, but it's still part of the police power? I'm sorry. Come again, Your Honor. I misread that. They work in conjunction with the other law enforcement agencies, Treasury and Port Authority Police. It's still just one unitary function of policing the harbor, isn't it? And they are just a component of it. Well, yes, Your Honor, but perhaps if the legislation would have entrusted them with such expansive powers, that would be the case. But to read a single sentence that you need to place something within your facility to give them police powers, it's a dangerous precedent. Not only that, Your Honor, the Act 12 incorporates the interagency. But why makes it dangerous? Because there's nothing in there that says that they have law enforcement powers or tax collection powers. There's nothing in there. In addition, Act 12 is premised on, it merely incorporates an interagency agreement where the police and also the Treasury were a party of. They make no mention of what's Port Authority involved in any of this. The clauses of the agreement, I don't think they even mention the Port Authority in the first place. And in addition, in the memorandum of understanding that the very first page, it says we, Port Authority, we need you Treasury because we do not have, and I quote, the legal authority to conduct this program. They do not have the legal authority to do that. They were acting within the scope of their nature as a marine. They don't have the legal authority to do the inspection? Excuse me, Your Honor? They don't have the legal authority to do the inspection? No, for that particular regard, they were talking about tax collection because they were dealing with Treasury. They were bringing Treasury into the program because they said we don't have the legal powers that you have to conduct this operation. Right? I don't know that there's a similar agreement with the police department. There could be, but we haven't been able to conduct this discovery, Your Honor. So, Your Honor, we have to stress that this is not a governmental function. They admitted on the Mercadeo V. Vasquez case that the enhanced security fee was charged for the use of facilities. That is not governmental in nature. They charged Waterfish, Dockers Warehouse, because it's a use of the facility. They conceded that, and it's stated in the opinion of Magistrate Judge McGivern. For the record, admitted that it's a facility use charge. It's not what they claim it to be. They have been regarded by the FMC, the Port Authority has, as a marine terminal operator under the Shipping Act of 1994, which is an entity in the business of providing port services such as Dockers, Waterfish, Warehousing, and others. And this is just another of those services. And even if this Court were to hold that Grajales is not dispositive because of intervening change in law, we submit that this case is very different from the Thacker V. TDR, Tennessee Valley Authority case. In the first place, the Port Authority was created to be separate and apart from the Puerto Rico government. Okay? By state law. This is a federally owned corporation. It's owned by the federal government. It is not separate and apart, and it was created not by state law, but by Congress. The Port Authority can be sued, has the power to do so, without exception. So, I believe my time is up. If the Court has any more questions. Thank you. Well, I appreciate it. Thank you very much. Your Honor, may it please the Court. I would like to clarify PRPA's immunity claim in this case.   One of the reasons is that it's a very limited scope. For purposes of our conduct, as implementing the cargo scanning program. We're not claiming that PRPA, because of those new functions delegated upon it, that it has become an arm for all purposes. Now, as to the law enforcement powers that plaintiff counsel states, the police powers are very broad. They don't simply equate to a law enforcement power. PRPA doesn't arrest anybody in the program. PRPA is conducting permitted administrative screening of the cargo that leaves the port. Just as the TSA personnel conducts administrative searches when we pass through security in an airport. Now, as to the MOU with the Treasury Department that the simply says that PRPA cannot conduct inspections related to tax collection efforts. We cannot go inside containers physically like the Treasury Department can and has historically performed in Puerto Rico. So, we ask the Treasury Department to collaborate with PRPA as to that goal in the program.  Now, those facilities, Your Honor, are located outside of the marine terminal operations. For a container to be scanned, it has to leave a marine terminal operations and go through the scanning facilities. So, it's even outside the operations that this court in the past has ruled to be proprietary or private in nature. Thank you so much. Thank you. All rise.